(No. 19894.

Harold Cusack, Defendant in Error, *vs.* Thomas Cusack, Jr., *et al.* Plaintiffs in Error.

*Opinion filed February 21, 1930—Rehearing denied April 14, 1930.*

Mayer, Meyer, Austrian & Platt, (Abraham Meyer, and Frederic Burnham, of counsel,) for plaintiffs in error.

Poppenhusen, Johnston, Thompson & Cole, (Floyd E. Thompson, Lawrence A. Cole, and Albert K. Orschel, of counsel,) for defendant in error in Supreme Court only.

Mr. Justice Heard delivered the opinion of the court:

Defendant in error, Harold Cusack, filed his bill in chancery in the superior court of Cook county, alleging the existence of a trust fund in the hands of Thomas Cusack, deceased, in his lifetime, placed there by plaintiffs in error Francis J. Cusack, Anna M. Cusack Johnson, Jane Evelyn Cusack, Thomas Cusack, Jr., and Charles Cusack, for the benefit of defendant in error, and praying for an accounting from said plaintiffs in error and plaintiff in error the Illinois Merchants Trust Company, trustee, with reference to such trust fund. The cause was heard by the chancellor in open court and a decree was entered dismissing the bill for want of equity. From this decree defendant in error appealed to the Appellate Court for the First District, where the decree of the superior court was reversed and the cause remanded to that court, with directions to order an accounting. The cause is now here on *certiorari*.

Plaintiffs in error Thomas Cusack, Jr., Charles Cusack, Francis J. Cusack, Anna M. Cusack Johnson and Jane

Cusack are children of Thomas Cusack, deceased. Defendant in error, Harold Cusack, when he was four years old was taken into the home of his uncle, Thomas Cusack, deceased, (hereafter referred to as Cusack,) and lived with him as a member of the family from 1898 to 1925, at which time he married. In 1913 he entered the employ of the Thomas Cusack Company, in which Cusack was heavily interested as a stockholder. He later became a director, vice-president and manager of the Chicago branch of the company. On September 19, 1924, 3802 shares of stock of the Thomas Cusack Company appeared on the books of the company registered in the name of Harold Cusack. Some of these shares he had purchased with his savings, while others had been placed in his name by Cusack. Numerous shares of the company stock appeared on the books in the names of each of Cusack's children. About that date an offer was made for the purchase of the Cusack interests in the company, and Harold and each of the individual plaintiffs in error gave to Cusack a power of attorney to conclude a sale of these stocks to Blair & Co. The stock was sold for par, and a check for $380,277 was delivered to Cusack for the stock standing in Harold's name and other checks were given Cusack for the par value of the stock standing in the name of each of the individual plaintiffs in error. These checks were delivered by Cusack to Harold and the individual plaintiffs in error, who severally endorsed their respective checks to Cusack, trustee, and the checks were all deposited in a trust account with the Illinois Merchants Trust Company. The arrangements for the opening of this trust account in the name of Cusack, trustee, had previously been made by Harold and one of Cusack's sons, by direction of Cusack, with the officials of the bank. These deposits were made, as shown by the bank signature card, by virtue of a "voluntary and mutual agreement between trustee and beneficiaries." No trust agreement was reduced to writing at that time, but the evidence

shows that Harold and each of Cusack's five children were beneficiaries of the trust, but it does not disclose the specific interest which each one had as a beneficiary in the fund. The evidence tends to show that Harold was not satisfied with the trust arrangement and had an interview with Cusack with reference thereto, as the result of which, on October 1, 1924, Cusack gave Harold $105,000 of the $380,277. In the latter part of December, 1924, each of the children executed a formal trust agreement in which such child made the father trustee of an individual trust, of which the child was to be the beneficiary. On December 22 Harold had an interview with Cusack, at which time a settlement of their affairs was made, the terms and conditions of which can only be determined by the acts of the parties and the statements contained in the documents executed by them. On December 23 the balance of the $380,277 was given to Harold in six checks, one for $40,000 and five for $47,055.40 each. Upon receiving these checks Harold executed a release and delivered the same to Cusack, in which he acknowledged the receipt of the $380,277 and released Cusack, individually and as trustee, from all claims arising out of the transaction in which the stock was sold and from all claims of any nature whatsoever. Harold thereupon endorsed the five checks for $47,055.40, one to each of the children, individually and not as trustee, retaining for himself the one for $40,000. Upon receipt of the five checks, aggregating $235,277, the children endorsed them over to their father, as trustee. Cusack died in November, 1926, up to which time a friendly relationship existed between Harold and plaintiffs in error. Shortly after Cusack's death Harold filed this bill asking for an accounting for the $235,277.

The vital question in the case is whether the evidence shows that on December 23, 1924, Harold Cusack endorsed the five checks to plaintiffs in error in trust for his benefit.

In reference to what took place at the time of the payment of the $105,000 Harold testified: "On that day, when the $105,000 check was given to me, Tom and Charles were in the outer office and Mrs. Parmelee (Cusack's secretary) was in her office, which was a little office off of Mr. Cusack's, as I remember it. Mr. Cusack was getting ready to go out. He had his coat and hat on. He said, 'Mrs. Parmelee has got a check for you.' There was a large room and two small rooms. Mrs. Parmelee is in her office, Mr. Cusack is in his, the boys are out here. The doors are all open. I don't know whether Tom and Charles were in my view and sight at the time I got the $105,000 check or whether they saw me get it or not. I may have had my back to them. They could have, because the offices were very small. I don't remember whether Frank was there on that occasion. I don't remember whether Mr. Cusack gave the boys a $5000 check on that occasion. I would not say. I never even paid any attention to it. I don't know whether he mentioned $5000 to the other boys on that occasion." He also testified that he did not say that he had had a conversation with Cusack in the presence of the boys at that time and that he would not testify to any specific conversation had in their presence at that time. He also testified: "I had a conversation with reference to the check for $105,000 with Tom Cusack, Jr., and Charles Cusack, in which I told them that I had understood this check was payment in full of all my interest; that I did not care to accept it, but it looked like dribs and dabs were better than none, and I expected to play ball with them the way they asked me to, and I was going to take their check and deposit it, although I was of the same opinion that it was certainly a dirty trick to hold back the balance of it, and I had not definitely decided whether or not to try a suit or let it go, or what. And they replied: 'Well, now, we appreciate very much what you are doing, and the fact that Dad was nervous and

quite sore people did not come down to see him from the company.' "

Charles Cusack testified with reference to the payment of the $105,000 check: "A meeting took place on October 1 in 804 People's Trust building at which my father, Harold, Tom and I were present. It was after lunch. We waited in the outer office until everybody arrived and then went into my father's private office. At that meeting my father said: 'I am giving Anne, Evelyn, Frank and Charlie $5000 and I am giving Tom $9500, (which includes $4500 worth of stock that he had purchased out of his own money four or five months before the sale took place,) to tide you over and allow you to meet whatever expenses you will have to meet in the next few months until definite arrangements can be worked out for our mutual future. I am giving Harold $105,000, as he does not want to have his finances in any way connected with ours—wishes to be by himself, free from any advice or direction of mine; and this squares accounts with us in full, for everything.' " He denied Harold's version of the conversation.

With reference to this transaction Thomas Cusack, Jr., testified: "Dad said: 'I have called you here to give you some money. I am giving Anne, Evelyn, Frank and Charles $5000 to take care of any expenses until we make arrangements for the disposition of the rest. I am giving you, Tom, $5000 for the same reason and $4500 to take care of the stock that you purchased yourself. And so far as Harold is concerned, he does not want to come in with us in our financing, so I am giving him $105,000 to take care of the stock that he purchased, plus anything else that—a great deal more—and that squares us all.' "

With reference to what took place at the time of Harold's receipt of the $40,000 check and the $47,055.40 checks, Harold testified: "Well, after Mr. Cusack and I got through talking, Anne Cusack and Evelyn Cusack and Frank Cusack came into the office with Charles Cusack.

They were asked to endorse some checks that were lying there, over to an account called 'Thomas Cusack, trustee.' I refer to five checks that were made out in my name for $47,055.40, or something like that. I did not see the checks actually made out. Charles brought one or two of them and Mrs. Parmelee, who is Mr. Cusack's secretary, brought the others. There was also a check for $40,000 that was payable to me. These checks were handed to me in that conversation I had with Thomas Cusack and with the other members of the Cusack family on December 23, 1924. At the time these checks were made out there was conversation between myself, Thomas Cusack, Sr., Charles Cusack, Thomas Cusack, Jr., Francis Cusack, Anne Cusack and Evelyn Cusack. Charles did not say anything to me at the time he laid them down in front of me. While I was endorsing those checks, Anne Cusack, Evelyn Cusack and Frank Cusack came into the office. Anne said, 'What? Another conference?' I looked up and said, 'Yes.' I turned the check over to her that I had endorsed, and she said, 'What is this?' I said, 'This is some money I am turning over to you to take care of, because the only way I can get my money is to do what Dad wants me to do.' She looked at it and said, 'Gosh, I haven't seen so much money in my life as I have seen in the last three or four days, but it just goes through my hands. It does not do me any good.' Evelyn just signed hers. I don't know what she said. She is quite a witty girl. She made some witty remark that I don't remember. After these checks were endorsed by myself and by the other children I think the girls had an appointment somewhere. Either Anne was going to the Blackstone or just came from there or something. Frank made a get-away. In fact, the two girls left, and there remained—Charles and Tom were left out in the office. I was getting ready to go home myself. We were all alone there. I said, 'Well, I hope you fellows realize what I have done—that I have just turned

over a lot of money to you.' I said, 'I could have been pretty nasty about it if I wanted to.' Tom put his arm around my shoulder and said, 'Harold, we appreciate it very, very much.' He said, 'You never know but what Dad might do the same thing to us.' He said, 'It may come your turn some day to be able to do a good turn to us, and we want you to know we appreciate everything you do, and we always consider you our brother and we will take care of you.' " He testified that neither at the time of the delivery of the $47,000 checks, nor before that time, was anything said about his giving these checks to the children as a gift.

Charles Cusack testified that on December 22, 1924, he left Chicago at 11:30 A. M. for Cuero, Texas, and did not return to Chicago until about January 8, 1925; that he did not get his check until somewhere between January 8 and 10 and was not present at any meeting when the five checks were endorsed by Harold. Francis Cusack testified that he was not present at the meeting on December 23 when the checks were endorsed by Harold and did not get his check until some time after Christmas. Jane Evelyn Cusack testified that she was not at the meeting on December 23 and that she got her check at home.

Thomas Cusack, Jr., testified with reference to December 23, 1924: "I was at that office toward the latter part of the afternoon of December 23, 1924, and saw Harold there that day. I think I saw Mrs. Parmelee too. I did not attend any meeting in my father's office that day. I knew that Mr. Connell and Mr. Cornwell would be there. I did not see them until they went out. I did not see Charles nor Anne nor Frank nor Evelyn that day at any time. I was not on that day at any time in the private office of my father with Mr. Connell, Mr. Cornwell and my father and Harold, or with the others without Harold. As he left the meeting that he had with Dad and Mr. Connell and Mr. Cornwell they came out of the office, and I

was in the general office, and Harold came out and we stood by the window, and I said, 'Well, are you all fixed up?' How is everything?' And he said, 'Everything is fine.' He said, 'I got some money and I am perfectly satisfied. I am tickled to death.' " He testified that his check for $47,055.40 was given him December 24 by either his father or Connell.

In regard to December 23, 1924, Anna Cusack Johnson testified: "I was not at my father's office on December 23. I was never present at any time when Harold was endorsing five checks for $47,000 odd dollars. Harold never said to me: 'This is some money I am turning over to you to take care of. I am turning over checks for $47,000 which I wish you to take care of for me. This is the only way I could get the check here for $40,000. In addition to endorsing these checks I have had to sign a release as well, releasing Dad from all responsibility, and I am passing that responsibility on to you.' I never said to Harold at any time or place: 'Gosh, I haven't seen so much money in my life as I have seen in the last few days, but it just goes through my hands. It does not do me any good.' "

Harold testified to conversations had by him with each of the Cusack children after December 23 tending to show admissions on their part of a trust relation with reference to the proceeds of these five checks. All of such testimony as to such admissions was specifically denied by each person claimed to have made such admissions in regard to such trust. The plaintiffs in error testified that while Harold did not state to them the arrangements under which the $47,055.51 checks were turned over, they knew why they received them from information from either their father or Connell, either at the time of the reception of such checks or prior thereto.

After the receipts of the $47,055.40 by the individual plaintiffs in error Harold obtained from each one of them

an agreement. These were identical, with the exception of the name of the person to whom the check was given, in the body of the instrument, and the signature, as follows:

"In consideration of the sum of $47,055.40/100 this day given to Thomas Cusack, Junior, by Harold Cusack, said Thomas Cusack, Junior, agrees to re-pay to Harold Cusack the amount of the United States income tax for the year 1924, arising from or growing out of the sale by Harold Cusack of 471 shares of stock of the Thomas Cusack Company of New Jersey, which tax the said Harold Cusack will have to pay to the United States government in the first instance as a part of his income tax for the year 1924.
THOMAS CUSACK, JR.

"Dated at Chicago, Illinois, this 23rd day of December, 1924."

Paul Sparks, an employee of the Illinois Merchants Bank who did income tax work for the bank, testified that in the early part of January, 1925, he was present at a meeting with Thomas Cusack, Thomas Cusack, Jr., Charles Cusack, Harold Cusack and witness' father, another employee of the bank, held for the purpose of explaining the five $47,055.40 checks with reference to the income taxes of the various parties; that Cusack was asked what these checks were for, and he said that they were payments made by Harold to the children for the purpose of balancing the accounts of the various children with the account of Harold; that under the terms of the agreement, when the stock was sold Harold had shares in his name which belonged to the other children, which were sold in the name of Harold so that the sale could go through quickly, and that these checks were to offset those stock shares which had been held by Harold; that they did not affect the income tax return at all; that Harold did pay the tax and was reimbursed by the children later for the tax; that witness was shown the five contracts between Harold and the Cusack children and asked Harold the purpose of these contracts; that he said the contracts were drawn up to reimburse him for the money which he

had paid out on shares of stock which he held in his name which rightfully belonged to the other children; that Harold asked him to get the figures ready so that they could reimburse him; that he prepared the statement and sent it, with a letter, by mail to Harold. The letter and enclosure were introduced in evidence and are as follows:

"ILLINOIS MERCHANTS TRUST COMPANY,
CHICAGO, *June 27, 1925*.
"*Mr. Harold Cusack, 2900 Straus Building, Chicago.*

"DEAR MR. CUSACK—In accordance with conversation this morning, I submit the figures prepared from information at hand regarding the amounts due you from Charles, Jane, Thomas, Jr., Anne and Francis Cusack, said amounts being due by reason of 2355 shares capital stock held in your name and sold as such which in reality belonged to the above parties. The tax having been paid by yourself, the enclosed computation shows amounts due you by reason of having paid the income tax on the sale.

"Yours very truly,
PAUL C. SPARKS."

The enclosure was as follows:

"Total shares as shown by contract agreements, (each contract 471 shares—five contracts) .......................... 2,355

Sale price in hands of Harold Cusack (2355 shares @ $100 per share) ............... $235,500.00

Value at time of gift, held in name of Harold Cusack, per share, $70.63.

Charles E. Cusack, 471 shs. @ 70.63 per share, $33,266.73
Jane E. Cusack,    471 shs. @ 70.63 per share,  33,266.73
Thos. Cusack, Jr.  471 shs. @ 70.63 per share,  33,266.73
Anne M. Cusack,    471 shs. @ 70.63 per share,  33,266.73
Francis F. Cusack, 471 shs. @ 70.63 per share,  33,266.73

Total value of gifts.................——166,333.65

Profit on sale........................ $69,166.35

Tax of 12½% of profit on sale (⅛) of $69,166.35 ............................ 8,645.79

Charles E. Cusack, share 20% ............. $1,729.16
Jane E. Cusack,    share 20% ............. 1,729.16
Thomas Cusack, Jr. share 20% ............. 1,729.16
Anne M. Cusack,    share 20% ............. 1,729.16
Francis F. Cusack, share 20% ............. 1,729.16

                                          8,645.79"

Then follow figures penned by Harold Cusack:

"Total tax .............................$19,994.27
Paid 4/15 ............................ 5,000.00
Paid 6/15 ............................ 14,884.27
Paid ... ............................ 4,942.12
.............................. 9,942.13    4,971.07
9/15 ............................ 4,971.07    1,296.34
                                     $4,971.06 $3,674.73"

Harold denied that the statements to which the witness testified were true. The income taxes as figured by Sparks were paid Harold by two checks signed "Thomas Cusack, Trustee," one dated September 24, 1925, for $3674.73, and one for $4971.06, dated December 17, 1924, aggregating $8645.79, as shown by the Sparks statement above. The checks were cashed by Harold and the proceeds appropriated to his own use.

From a careful study of the entire record it is evident that very shortly after the sale of the stock in September, 1924, it became a controverted question between Harold and Cusack as to the amount Harold was entitled to receive out of the proceeds of the sale of the stock which was registered in Harold's name, Harold claiming that he was entitled to receive the entire amount and Cusack not being willing to accede to his claim. It is also evident that on December 22, 1924, a compromise agreement was entered into by them, as a result of which the six checks were turned over to Harold on December 23, 1924, in full settlement of all of Harold's claims against Cusack, individually and as trustee, and that they were so accepted by Harold. Harold was not an illiterate person unacquainted with business transactions, but had been in the active conduct of an important business enterprise for several years. During the time he was engaged in the business the stock of the company increased in value from $20 or $25 per share to par. The evidence shows that he fully understood the release executed by him and the contracts for reimburse-

ment of the income tax which he exacted from the individual plaintiffs in error, as also the letter and itemized statement as to the income tax sent him by Sparks, as he, in his own writing on the statement, adopted the statement and used the figures therein contained as the basis of his reimbursement for the income tax paid by him. The settlement was made by him without fraud, and with full knowledge of the facts he voluntarily accepted and cashed the check for $40,000 in full settlement, and he could not, therefore, question such settlement. (*Kall* v. *Block Co.* 319 Ill. 339; *In re Estate of Cunningham,* 311 id. 311; *Janci* v. *Cerny,* 287 id. 359; *Canton Union Coal Co.* v. *Parlin & Orendorff Co.* 215 id. 244.) That he was not dominated by Cusack is evident from the fact that Cusack wanted the entire Cusack funds to remain intact and be utilized as one fund, while Harold, who was about to marry contrary to the wishes of the Cusack family, insisted on having the possession, control and management of his share of the receipts from the sale.

Where it is sought to establish a trust by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion, and if the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of a trust it is not sufficient. (*Wies* v. *O'Horow,* 337 Ill. 267; *Geraghty* v. *Geraghty,* 335 id. 494; *Neagle* v. *McMullen,* 334 id. 168.) When all the facts and circumstances in evidence in this case are considered, the proof tending to show such trust falls far short of being of such clear and convincing character. The chancellor was fully justified in dismissing defendant in error's bill for want of equity.

The judgment of the Appellate Court will be reversed and the decree of the superior court affirmed.

*Appellate Court reversed, superior court affirmed.*