(No. 30350.—

JULIO CARRILLO, Appellant, *vs.* WALTER J. O'HARA *et al.*— (AUTOMOTIVE EXPORT ASSOCIATION (1936) INC., *et al.*, Appellees.)

*Opinion filed September 24, 1948.*

LEONARD & LEONARD, and LOMMEN D. ELEY, (GEORGE E. W. LEONARD, and GERALD TURNBULL, of counsel,) all of Chicago, for appellant.

JOHN A. BROWN, and OTTO M. HAMER, (CHESTER D. KERN, of counsel,) all of Chicago, for appellees.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

This appeal, predicated upon the involvement of a freehold, (*Wharf* v. *Wharf,* 306 Ill. 79,) is from a decree of the circuit court of Cook County dismissing a complaint for want of equity.

The record in this case is voluminous and the evidence produced before the master is involved and very conflicting. We state the uncontroverted facts now, for a better understanding will be had of the theories embraced in the

various pleadings. The conflicting evidence is hereinafter set forth in substance as our conclusions are reached.

In 1936, the plaintiff, Carrillo, admittedly owned all of the capital stock of the Middle West Export Corporation and, as a consequence, was in full control thereof. The same year the defendant O'Hara, although owning only one share of the eighty-two shares outstanding of the Automotive Export Association, absolutely managed and controlled that corporation. Both corporations were of Illinois origin, and the two men carried on their separate ventures in Chicago, exporting automotive supplies to different parts of the world. Each venture was rather minute in size. Each was carried on in common quarters. In that year the two men combined the two ventures into some sort of union, the precise character of which is in bitter dispute. Contemporaneous with this jointure, or nearly so, the evidence thereon not being entirely clear, one Aprahamian, also an exporter of automotive supplies, became involved with the two men in a common venture in the export field. According to the evidence it was Aprahamian who proposed that he go to South Africa on a mission to sell the products of the manufacturers represented in the export field by each of them. Aprahamian lacked funds and, evidently, prestige. To provide the first, Carrillo contributed $1500 of his personal funds and O'Hara put in $1000. The Automotive Export Association was revamped in certain respects, *i.e.*, by changing the corporate name to "Automotive Export Association (1936) Inc.;" O'Hara resigned as the president of Automotive, Aprahamian became president of Automotive 1936, O'Hara became vice-president and Carrillo became a director and treasurer thereof. The $2500 was placed in a distinct bank account, $1500 was withdrawn therefrom and given to Aprahamian, and he departed on his African mission. The remaining $1000 was left in the account and it was disbursed in monthly installments of $100 to Aprahamian's wife for her mainte-

nance during the absence of her husband. The percentage of division of the commissions resulting from Aprahamian's sales in Africa, between the three men, is a disputed factor. Whatever the agreement was between the three in respect to this venture, including the division of profits therefrom, it was completely oral. Aprahamian was down in Africa a long time. In fact, according to undisputed testimony in the record, he never came back. However, in 1936, 1937 and 1938 he sold quite a quantity of goods, though the amount was not up to the expectations of the three men. The money involved in these African sales traveled in and out of the accounts and books of Automotive 1936.

O'Hara, and to a degree Carrillo, was not at all averse toward engaging with others in business ventures related directly or indirectly to the automotive field and products. Such ventures were either copartnership or corporate enterprises, and in some instances copartnerships operated under corporate names. The fates were rather uniformly unkind to those outside ventures, some died aborning while others expired in their childhood after vicarious and none too successful existences; most of those deaths were due to a lack of adequate financial resources.

Some of these ventures were, at different times, housed in a one-story factory building at 2305 North Pulaski Road, (also known as Crawford Avenue;) the building then being owned by the State Receiver of defunct banks. He was willing to sell the building for $6000, subject to $2700 in accumulated back taxes which a purchaser must assume; the remainder of $3300 had to be in cash. O'Hara and Carrillo withdrew $200 from the account of Automotive 1936 on June 16, 1939, by check signed by them under the name of Automotive 1936, as vice-president and treasurer, respectively, payable to the receiver, and secured an option on the property for that sum. It was necessary to raise $3100 to complete the purchase, for neither Automotive 1936, O'Hara, nor Carrillo, together or alone, had the neces-

sary funds. Charles Kulishek, a business acquaintance of O'Hara and Carrillo agreed to loan the sum of $2300. The remainder, including an item of $69 interest to Kulishek, totalling $869, was raised in the following manner: Carrillo took $500 of his personal funds, added to this $369 which was withdrawn by check from the Automotive 1936 bank account, on December 11, 1939, payable to Carrillo and signed by the two as the vice-president and treasurer, respectively, of the company. Carrillo thereupon purchased a cashier's check for $869 payable to him. This he endorsed over to Kulishek and delivered the same to him. Kulishek added to this the $2300 and purchased a cashier's check for $3100 which was delivered to the receiver; and that official then delivered a prior executed quitclaim deed to O'Hara as the sole grantee therein.

Contemporaneously with the making of the loan a written instrument termed by the parties a "receipt and agreement" was signed by O'Hara and signed and acknowledged by Kulishek before a notary public. In effect it was a receipt by O'Hara for the $2300 and an agreement between O'Hara and Kulishek that O'Hara was to convey the purchased property to Kulishek as collateral security for the loan, and when the loan was repaid, Kulishek was to reconvey the pledged property to O'Hara. The loan was evidenced by a note for $2300 dated December 12, 1939, to Kulishek, bearing the name of Automotive 1936, signed by O'Hara as vice-president and by Carrillo, with no designation of his capacity or office. An attorney was retained to clear the property of the $2700 tax lien. He did so in a tax foreclosure proceeding at a cost of $1500 in satisfaction of the tax lien and his fee amounted to $500. Automotive 1936, O'Hara and Carrillo, singly or in combination, could not produce the needed $1500. Recourse was had by O'Hara and Carrillo to one Rapp, an officer of the F. & B. Manufacturing Co. which was represented in the

export field by Automotive 1936. The two were loaned $1500 on their joint note; which was ultimately paid in part by accrual of commissions due Automotive 1936 on sale of the company's products. The total of the commissions was small, the major portion of the debt being retired by credit for machinery turned over to the company to the amount of twelve or thirteen hundred dollars. The $500 attorney's fee was paid out of Automotive 1936 operations.

By January, 1944, the obligation to Kulishek had been paid down to around $800. This balance was paid by money borrowed by O'Hara from Frank O. Reid; the loan being secured by a mortgage lien on the property and this lien still exists insofar as the record shows. When Kulishek's loan was paid in full he reconveyed the property to O'Hara alone by a quitclaim deed in compliance with the "receipt and agreement" mentioned before. O'Hara still holds the title to the property by virtue of that deed.

During the years the property produced an income of monthly rentals which were paid to O'Hara. There is a conflict between Carrillo and O'Hara as to whether all of the rentals were paid over to Automotive 1936. Material expenditures were necessary on the property and were made soon after it was acquired from the receiver. We cannot ascertain from the record whether these expenditures were made entirely from property income or from other sources in part. Rental agreements or arrangements covering the property were made by O'Hara with the successive tenants. To the Nu-Dell Manufacturing Co., the last tenant to lease at $250 per month, he gave an option to purchase the property for $18,000.

Carrillo's theory upon which he bases his alleged right to invoke the aid of equity in setting matters aright between himself and O'Hara rests upon two piers of alleged facts. Either one, if good, would lead to the same point, *i.e.*, the

sharing of the property, or its worth, with O'Hara, directly or through the medium of equal stock ownership in Automotive 1936.

His first theory is predicated upon his allegation of the reaching of an oral agreement with O'Hara in 1936 whereby the two export businesses were to become one. He was, according to his allegations, (a) to drop Middle West, (b) turn in the assets thereof, such as customers, good will, etc., (c) put $1500 of his personal funds into the Automotive Export Association, and (d) contribute all his time and labor to the new endeavor, which was to use the corporate structure of Automotive. O'Hara, he alleges, in turn agreed to (a) deliver to him one half the shares of the capital stock of Automotive, and (b) cause to make upon the records of Automotive those changes necessary to accurately reflect the agreement of the parties. It is alleged that all the things Carrillo orally agreed to do he did in full measure, thereby fully consummating his part of the agrement. Carrillo alleged O'Hara only caused the corporate name of Automotive to be changed to Automotive 1936 and did not cause those changes to be made in the corporate records to reflect the agreement whereby Carrillo was elected a director and treasurer. O'Hara never gave to Carrillo one half of the capital stock of Automotive 1936, although often requested to do so.

Concerning the property phase of the dispute, Carrillo alleged he and O'Hara jointly agreed in July, 1939, to jointly purchase the property; that while such agreement was oral in its inception, it was fully consummated and carried out by the investment in writing, made by Carrillo, in the purchase thereof, in the negotions with Kulishek for the loan, and in the execution of the "receipt and agreement" between Carrillo and O'Hara when the loan was made, which, by its terms, provided the property should be reconveyed by Kulishek to Carrillo and O'Hara, jointly, when the loan was paid. That such "receipt and agree-

ment," so signed by Carrillo and O'Hara, was to be delivered by O'Hara to Kulishek. Instead of doing so, O'Hara substituted the other "receipt and agreement" and informed Carrillo he had delivered the "receipt and agreement" agreed between them to be delivered. It is also charged Kulishek promised Carrillo, when the loan was reduced to around $800, that, upon the payment of the balance, he would reconvey to Carrillo and O'Hara, jointly. This was after he had been made acquainted by Carrillo with the true business relationship existing between himself and O'Hara with respect to the property. An undivided one-half interest is claimed in the property by Carrillo.

Carrillo alleged that in the reaching of the agreement with O'Hara in respect to the jointure of the two businesses and in the effectuating of the agreement, he placed implicit faith and confidence in O'Hara, believing he would do as he agreed. The same allegation is made in respect to the purchase of the property.

The answer of O'Hara, of course, negatived those allegations of the complaint damaging to him. Additionally he filed an affirmative defense, which, in substance, alleged that in respect to the alleged Automotive and Middle West jointures, there was no jointure, for Carrillo worked for Automotive 1936 as a mere employee and it was as a mere employee that Carrillo functioned, even though he was a director and treasurer of Automotive 1936; that there was no merging of the "lines" of the two in a common business in the manner Carrillo alleged; that the $1500 Carrillo put up was not for Automotive 1936 but was his contribution to the Aprahamian African venture which was something entirely separate and apart from any Automotive 1936 activity; that the funds employed in the African venture simply went in and out of Automotive 1936 as a device to employ the financial strength of the corporation. O'Hara further alleged that he purchased the property as a lone act and held the title thereto,

all for the Automotive 1936 corporation; all loans made in respect to the property and other obligations incurred in respect thereto, when paid, were paid with funds of Automotive 1936 which were part of the earnings thereof. The $869 was composed of $369 belonging to Automotive 1936, and $500 obtained from Carrillo as a loan, only.

On leave granted, Automotive 1936 filed an intervening petition and became a party defendant. The petition was signed and sworn to by the attorney for Automotive 1936. In substance, the intervenor pleaded the Automotive 1936 angle of the matters pleaded by O'Hara in his affirmative defense. Specific denials were made of allegations of the complaint which ran counter to the theory expressed in the answer. Finally, the answer avers the subject matter of the complaint and the relief sought to be in direct conflict with section 2 of the Statute of Frauds, and that the complaint is further defective because the allegations in respect to the "merger" of Middle West and Automotive fail to plead a compliance with the provisions on merger of corporations found in the Business Corporation Act.

Kulishek was a party defendant and filed his answer. To that we need grant no space, for he was voluntarily dismissed out of the action. To all answers to the complaint Carrillo made appropriate reply, and he answered the intervening petition with what amounted to a restatement of the complaint allegations.

Carrillo, in his complaint, asked this specific relief: That O'Hara be compelled to convey to him a one-half interest in the property, free and clear of all encumbrances, or, (a) the property be sold under court order and one half of the net proceeds be paid to him, (b) the court order O'Hara to cause the necessary changes to be made in the corporate records of Automotive 1936 to evidence his interest therein and that one half the capital stock thereof be issued to him, (c) for an accounting under court direction of the affairs and operations of the prop-

erty and of Automotive 1936, and (*d*), in addition to specific relief, he be relieved of all costs, damages, expense, attorneys' fees and charges wrongfully brought about by the wilful and unlawful acts of O'Hara, and for such other relief as the court deems meet. The intervening petitioner asked a dismissal of the complaint and a decree holding that the title to the property reposes in O'Hara in trust for Automotive 1936, subject only to the mortgage lien given by O'Hara to Frank O. Reid.

The master in the submission of his report to the chancellor separated it into parts: (*a*) facts and findings in regard to Carrillo's and O'Hara's alleged agreement concerning the conveyance of one half the capital stock of Automotive 1936, (*b*) the same about the alleged agreement to jointly purchase the property, and (*c*) the master's ultimate conclusions and recommendations. It was the conclusion of the master that Carrillo failed to prove the existence of the agreement for the conveyance of the stock and, furthermore, no agreement existed for the joint purchase of the property and for O'Hara to convey a one-half interest therein to Carrillo.

The separate ventures of Carrillo and O'Hara before becoming associated were personal business ventures for the individuals' exclusive benefit. Middle West and Automotive were utilized for whatever prestige or business advantage could be obtained from each held forth under a corporate name. In their association under the name of Automotive 1936, (which was in fact nothing more than Automotive with an amended name and new officers,) their subsequent conduct of the export business and other joint business ventures simply served to emphasize their joint use of the corporate structure for the same purposes.

We find the basic intent of Carrillo and O'Hara in becoming associated from the record evidence of their actions and expressions in respect thereto. The evidence, by a preponderance thereof, shows: (1) Carrillo aban-

doned Middle West after paying the debts of his export business and its corporate existence was in due course dissolved by the Attorney General; (2) when he went over to O'Hara and his Automotive, he took with him the accounts and good will of his export business, and they were not inconsiderable when compared with O'Hara's Automotive; (3) he contributed to this association with O'Hara as an additional investment, $1500; (4) that he devoted all his time and labors to the new arrangement covering Automotive 1936, and related ventures, from 1936 to the time he and O'Hara severed their relations many years later; (5) he became a director and treasurer of Automotive 1936; (6) he and O'Hara jointly participated in other enterprises, having a direct or indirect connection with the automotive field of endeavor, as copartners jointly engaged with others, wherein the commonalty of interests of the two were very evident; (7) he never received for his services a fixed wage or salary as an employee of either O'Hara or Automotive 1936, but, on the contrary, he withdrew from the business earnings channeled through the books of Automotive 1936 the following aggregate sum each year as stated, (what O'Hara withdrew in the same period is stated in brackets for comparison purposes,) 1936—$265, [$400,] 1937—$2000, [$2400,] 1938—$2200, [$2800,] 1939—$2143.99 [$2600,] $1940—$1200, [$1800,] 1941—$900 [$1200,] 1942— $750, [$1000,] a difference in total withdrawals of only $1541.01, an average yearly difference of approximately $270; (8) prior to 1936 O'Hara had bought up all the outstanding shares of Automotive for $2000 and returned them to the corporate treasury, thereupon he distributed 70 shares to his aged mother, 10 to a girl friend, 1 to an attorney for O'Hara and Automotive, and 1 to himself, a total of 82 shares, the balance never being issued; (9) O'Hara made voluntary statements to outsiders, White, Tremelling, and Drummond, that he and Carrillo were

equally interested in Automotive 1936, and to Hildebrand that the two owned it, these statements being made to them as individuals who did, at one time or another, have some business relationship with the two through the Automotive 1936 setup or otherwise; (10) Carrillo and O'Hara agreed the property should be purchased by them, each contributing time and labor to effectuate the purchase, Carrillo additionally advancing $500 of his personal funds for a certainty and possibly $369 additional; (11) the funds used in the reduction of the Kulishek loan, for the rehabilitation, repair and improvement of the property, for the settlement of the tax lien *via* foreclosure, (including the repayment of the F & B Rapp $1500 loan,) payment of taxes as they accrued, and other charges, all came from the money made by their joint efforts and funneled through Automotive 1936, whether O'Hara permitted all the property rentals collected by him to pass through Automotive 1936 books being a disputed question which an accounting of the property finances could clear up; (12) statements of O'Hara made to Rapp, Klein, Stark, Rivera, Wiesse, Cobden and Tremelling, that he and Carrillo owned the property; (13) a pre-organization agreement in writing between O'Hara, Carrillo and Wiesse pointing towards the organization of a corporation by the three, wherein O'Hara and Carrillo agreed to contribute thereto the property—subject to lien—as their joint material contribution, and, in return, each was to receive, of the capital stock of the new corporation, 200 shares of the 600 shares to be issued; and (14) an admission made under oath by O'Hara, when under cross-examination before the master, that he and Carrillo used Automotive 1936 corporation as a private copartnership. Other items of evidence could be set forth. They are, however, unnecessary and would extend this opinion to an unreasonable length.

From all of this it is clear beyond doubt that Carrillo and O'Hara intended to and did establish between them

a copartnership. It is equally evident they intended to be, and were, equal partners therein. Their combined export business operating under the name of Automotive 1936, and the venture into the purchase of the property, were only two items of the many activities of the partnership, which was an all-embracing affair. The two, acting in conjunction as partners, were not at all loath to seize upon what they understood to be an opportunity, alone or with others, to make money in a field wherein they felt themselves qualified to function, hence their many ventures. The Aprahamian-African affair thus turns out to be one of those ventures and is thus shown in its true perspective against the background of the basic copartnership of the two.

On the basis of our study and evaluation of the evidence we are of the opinion both the master and the chancellor erred in placing undue importance upon the question of the right claimed by Carrillo to one half of the capital stock of Automotive. Below that claim of right there had to be the foundation of agreement between the parties if it is to prevail. The testimony of the two principals on the question of the existence of such agreement is directly opposite and recourse was necessary to other media to determine that particular issue. In our analysis and evaluation of the evidence we have kept in mind, and used, the right of equity to penetrate behind the screen of corporate entity in order to apply the equitable maxim that equity will look through the forms to the substance of a transaction in order to ascertain the true relationship of the parties. It is the duty of equity in the proper circumstance, as here, to discover and carry into effect the real intention of the parties and enforce it according to the sense in which it was understood by them, as shown by their subsequent acts and conduct with reference thereto.

The conflict in the evidence over whether O'Hara substituted "receipt and agreement" for another cannot be

directly resolved from the evidence. An inference could be drawn on this subject from a study of all of O'Hara's actions as disclosed in the record; however, we do not find it necessary to do so. We do hold, however, that O'Hara's testimony that he acted in the purchase and took title for the ultimate sole benefit of Automotive 1936, *sans* Carrillo, certainly does not square with the proved facts establishing the copartnership agreement. The agreement between the two was oral, but Carrillo has fully performed his part of that agreement which interposes a barrier against the invoking of the Statute of Frauds. Under the agreement's terms, which the proof showed to be very simple and clear, each partner was entitled to one half of the income therefrom. Carrillo in his answer to the intervening petition claimed that a resulting trust arose out of the purchase of the property because he and O'Hara agreed they would make the purchase for themselves alone, and not for Automotive 1936, and, further, that all of the moneys expended in paying for the property came from the funds of Automotive 1936, in which he claimed a one-half interest. This, reduced to the ultimate fact, in the light of the proved facts we have heretofore stated, simply means that their joint purchase was paid for entirely by funds one half of which belonged to and was the property of Carrillo, and exclusive title to the property was taken by O'Hara, who now claims to be the mere title holder for the true owner, *i.e.,* Automotive 1936. "While neither an express nor a resulting trust can be created by parol agreement the intention of the parties may be shown thereby, and the existence of such parol agreement will not prevent a resulting trust if it is otherwise established by clear and convincing evidence." (*Geraghty* v. *Geraghty,* 335 Ill. 494.) "Where it is sought to establish a trust by parol evidence, the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion, and if the evidence is doubtful or capable of rea-

sonable explanation upon theories other than the existence of a trust it is not sufficient." (*Cusack* v. *Cusack*, 339 Ill. 108.) "A resulting trust does not depend on contract or agreement but is founded on a presumed intent which arises out of the acts of the parties. [Citation] It arises the instant legal title is taken, if it arises at all." *Kane* v. *Johnson*, 397 Ill. 112.

The findings of fact and conclusions of the master were approved by the decree of the chancellor and will not be disturbed on review unless manifestly against the weight of the evidence. In this case we must hold the master's conclusions of fact, and the decree based thereon, are clearly contrary to the manifest weight of the evidence. One half of the money which was used to consummate the purchase of the property belonged to Carrillo. The acquisition of the property was the joint action of Carrillo and O'Hara, and when the latter took title to the property, a resulting trust instantly arose in favor of Carrillo to the extent of his interest, *i.e.*, one half plus whatever additional percentage is required to accurately gauge the additional $500 contribution he made to the purchase price.

In order that complete equity may be done between the two, the one remaining question involving their respective rights and interests in the income and outgo on account of the property can only be determined by an accounting had under the control of the chancellor.

The decree of the circuit court of Cook County dismissing the complaint for want of equity is reversed, and the cause is remanded with directions to proceed and enter a decree in accordance with the views stated herein.

*Reversed and remanded, with directions.*