(No. 43012.—

THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, v. ROCCO PINTOZZI *et al.,* Appellants.

*Opinion filed November 24, 1971.—Rehearing denied Jan. 27, 1972.*

WARD, J., took no part.

ANN R. LAVIN and EDWARD J. CALIHAN, JR., both of Chicago, for appellants.

WILLIAM J. SCOTT, Attorney General, of Chicago, (FRANCIS T. CROWE, CALVIN C. CAMPBELL, MORRIS BROMBERG, SAMUEL E. HIRSCH and GERALD T. ROHRER, Assistant Attorneys General, of counsel,) for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

The State of Illinois instituted an action in the circuit court of Cook County the ultimate purpose of which is to collect from the defendants, Rocco Pintozzi and Frank Pintozzi (hereafter called principal defendants), a substantial amount of retailers' occupation tax. The original complaint named many other defendants both corporate and individuals, all of whom, except the principal defendants and their wives, were dismissed prior to the final order.

Rocco Pintozzi and Frank Pintozzi for many years have been engaged in the business of operating retail liquor stores. For several years their operation was in the nature of a partnership. About 1958 it was determined that the operation of their stores should be carried on through corporate entities. Thereafter these defendants caused to be opened and operated nine retail liquor stores located in Chicago and its suburbs. They also caused to be organized approximately 12 corporations which were involved at various times in the operation of these liquor stores. For a period of time one of the stores was licensed in the name of William Pape and later in the name of James O'Brien. Pursuant to the provisions of section 4 of the Retailers' Occupation Tax Act (Ill.Rev.Stat. 1967, ch. 120, par. 440 *et seq.*) the Department of Revenue made corrections in the various tax returns filed on behalf of the corporations and William Pape and made additional assessments of taxes due under the Act. Some of these assessments were reduced to judgment and others were not. The total amount of these judgments and assessments is $1,116,758.65.

The State's theory of the case is that the principal defendants were the real parties in interest in the operation of these liquor stores and that the corporate entities and individuals in whose names the operations were carried on

were but facades behind which these defendants operated. They collected the tax on retail sales from the purchasers but failed to remit to the State the tax due. They accomplished this by understating the gross receipts from the stores on the tax returns filed under section 3 of the Retailers' Occupation Tax Act, thus fraudulently retaining for their own use money collected as taxes due the State of Illinois. In this action the State seeks judgment against the principal defendants for the amount of these unpaid taxes and seeks to impose a constructive trust for the satisfaction of the judgment on the property both real and personal involved in the operation of the retail liquor stores and certain parcels of realty allegedly acquired with the proceeds of the fraudulent operations. Hazel Pintozzi, wife of defendant Rocco Pintozzi, and Geraldine Pintozzi, wife of defendant Frank Pintozzi, were joined as defendants because they are owners of interests in some of the real estate upon which the State seeks to impose a constructive trust.

On motion of the State a receiver *pendente lite* was appointed by the court to take charge of the property, both real and personal, involved in the operation of the various businesses. The receiver was also directed to take possession of the books, records and documents concerning the operation of the businesses. The receiver took possession and control as directed.

Following lengthy hearings the court made detailed findings of facts and conclusions of law on the many issues involved and incorporated the same by reference in its decree. The court entered judgment against the two principal defendants personally for the unpaid tax in the amount of $1,116,758.65. The court declared a constructive trust on the properties acquired by the principal defendants from July 1, 1959 (the date alleged in the complaint as the beginning of the fraudulent practices) to September 28, 1967 (the date the receiver was appointed).

The court also declared the places of business under the control and custody of the receiver to be part of the corpus of the constructive trust. The court directed that if the amount of the judgment is not paid within 30 days the receiver should proceed to sell the property and apply the proceeds to the satisfaction of the judgment. This appeal has been taken from that decree.

The judgment of the trial court against these two defendants can be broken down into different classifications, each being based on a different theory.

*First Classification:*

The Department of Revenue made an assessment of tax due against a corporation named No. 2 Countryside Food & Beverage, Inc. in the amount of $34,602.57. This amount was subsequently reduced to judgment against the corporation. Citation proceedings to discover assets disclosed that there were no assets of the corporation. The court found that Rocco and Frank Pintozzi were the officers or employees of the corporation who had the control, supervision and responsibility of filing the tax returns and paying the tax. The court found that these defendants wilfully failed to file the returns and make the payments and, under the provisions of section 13½ of the Retailers' Occupation Tax Act (Ill.Rev.Stat. 1967, ch. 120, par. 452½), held them personally liable for the judgment against the corporation.

The same proceeding was followed against a corporation named Double Value Liquors and Restaurant, Inc., and for the same reason said defendants were held personally liable for the judgment against this corporation in the amount of $99,432.87.

*Second Classification:*

On November 14, 1961, an application for a certificate of registration was filed for a liquor store located at 1423 West 55th Street in La Grange. The application was purportedly executed by William Pape who also purport-

edly filed the tax returns with the Department of Revenue for the periods of January 1, 1962, through December 31, 1964, and from January 1, 1965, through April 30, 1965. The Department of Revenue made assessments of taxes for the periods, and judgments were entered on those assessments against William Pape in the amount of $161,317.21 for the period from January 1, 1962, through December 31, 1964, and in the amount of $23,935.65 for the period from January 1, 1965, through April 20, 1965. These judgments were affirmed by this court in 40 Ill.2d 442. In the case now before us the trial court found that Rocco and Frank Pintozzi had the ownership, control and direction of this store from its inception and had caused the application for registration and the tax returns to be filed by persons who forged the name of William Pape thereto. The court held the two defendants personally liable for the amount of these two judgments.

*Third Classification:*

Judgments had been entered against the following corporations in the amounts listed for assessments of tax which had been found to be due:

Countryside Food & Beverage, Inc. d/b/a Prestige Liquor, for a period from January 1, 1962 through October 31, 1966

............................$362,358.70

No. 3 Countryside Food & Beverage, Inc. for a period of May 1, 1965 through February 28, 1966

............................78,085.00

Fillmore Liquors, Inc. for a period from May 1, 1965 through May 26, 1966

............................114,826.89

New Pilsen Liquors, Inc. for a period from January 1, 1965 through

February 28, 1966
................................93,982.57
Downers Liquors, Inc. for a period
from May 1, 1965, through April 28,
1966
................................12,476.79
Downers Liquors, Inc. for a period
from May 12, 1966 to June 30, 1967
................................53,985.08
Westview Liquors, Inc. for a period
from June 28, 1965 through April,
1966
................................8,209.39
Fillmore Liquors, Inc. for a period
from May 12, 1966 through May 31,
1966
................................1,681.66
Countryside Food & Beverage, Inc.
for a period from May 12, 1966 to
May 17, 1966
................................ 372.15

The trial court held that these corporations were the alter egos of the two principal defendants who used these corporations as devices by which they committed fraud on the State. The court held that in equity these defendants should be personally liable for the obligations incurred in the names of these corporations and held said defendants personally responsible for the judgments.

*Fourth Classification:*

Certain assessments had been made against the following corporations for taxes due under the Act, which assessments had not been reduced to judgment. These assessments were as follows:

Westview Liquors, Inc. from May 12, 1966 through February 7, 1967
................................21,330.63

1937 Corp. from July 1, 1967 through September 27, 1967

............................10,774.54

Suburban Management Enterprises, Inc. from June 1, 1966, through April 30, 1967

............................18,713.52

New Pilsen Liquors, Inc. from May 12, 1966 through November 10, 1966

............................5,939.95

Community Liquors, Inc. from July 1, 1967 through September 27, 1967

............................10,159.52

1610 Corporation from December 1, 1966 through June 30, 1967

............................4,573.96

On the theory that these corporations were the means of doing business used by Rocco and Frank Pintozzi the court held that the tax liabilities imposed on these corporations were in equity the obligations of these two defendants and held said defendants personally responsible for the amounts of said assessments.

Defendants admit that the evidence, if properly admitted, will support the findings of fact except as to the findings concerning the realty owned by defendants. They contend, however, that the facts thus found were proved by evidence unlawfully secured.

The defendants urge that the seizure of the books and records by the receiver and the use of some of the documents which came into his possession as evidence against them violated their rights under the fourth amendment (search and seizure) and the fifth amendment (self-incrimination) of the Federal constitution and article II, section 6 (search and seizure), and section 10 (self-incrimination) of the Illinois constitution of 1870.

The receiver did not voluntarily turn the records in his possession over to the State of Illinois for its use as

evidence at the trial as defendants contend. The receiver had been ordered to take possession of the property of the corporation including the books and records on September 28, 1967. On October 4, 1967, the court directed the receiver to permit the Department of Revenue and any party to examine the books and records in the receiver's possession. On April 7, 1969, the court entered an order authorizing the Attorney General of Illinois to withdraw, upon a written receipt therefor, books and records in the possession of the receiver.

A distinction must be drawn between the obtaining of possession of the books and records by the receiver and the receipt of the same by the Attorney General to be used by him as evidence against the defendants. The taking of the books and records by the receiver under order of the court was not a seizure. A receiver is an officer of the court and his possession is the possession of the court itself. *(Anderson v. Macek, 350 Ill. 135, 137.)* The appointing of a receiver is an exercise of equity jurisdiction and rests largely in the discretion of the appointing court, the object being to secure and preserve the property for the benefit of all concerned so that it might be subjected to such order as a court might render. *(Chicago Title and Trust Co. v. Mack, 347 Ill. 480, 483; Evans v. Illinois Surety Co., 319 Ill. 105, 109.)* The possession and control over the books and records of the corporations passed from the control and possession of the corporations and the principal defendants when taken over by the receiver. The same were thereafter in the possession and under the control of the court through its officer, the receiver. There was no seizure at this point.

A year and a half later, on April 7, 1969, possession of some of the books and records passed from the receiver to the Attorney General of Illinois and some of these documents were thereafter used as evidence in the case. In *Dier v. Banton, 262 U.S. 147, 67 L.Ed. 915,* the Supreme Court held that the right of an alleged bankrupt to protest

against the use of his books and papers relating to his business as evidence against him ceases as soon as his possession and control over them passed from him by the order directing their delivery into the hands of the receiver. While his books and papers in the course of the bankruptcy proceeding are taken out of his possession and control, his immunity from producing them secured him by the fourth and fifth amendments does not inure to his protection. He loses any right to object to their use as evidence because, not for the purpose of evidence, but in the due investigation of his alleged bankruptcy, the control and possession of his books and papers relating to his business were lawfully taken from him. To the same effect see *In re Fuller, 262 U.S. 91, 93-94, 67 L.Ed. 881, 883,* where the court stated that the bankrupt's privilege secured to him by the fourth and fifth amendments is that of refusing himself to produce incriminating evidence against him, anything which he owns or has in his possession and control; but his privilege ceases on a transfer of the possession which takes place by legal proceedings even though such transfer may bring the property into the control of one properly subject to *subpoena duces tecum.* See also *Johnson v. United States, 228 U.S. 457, 57 L.Ed. 919; In re Harris, 221 U.S. 274, 55 L.Ed. 732.*

Under the authority of the above cases there was no violation of defendants' fourth amendment rights when the receiver, pursuant to order of the court, surrendered possession of certain documents in his possession to the Attorney General.

Considering now fifth-amendment rights, the defendants assert that certain of their personal items came into the possession of the receiver. They do not claim that any of the documents surrendered by the receiver to the Attorney General or any documents offered in evidence were their personal documents. It therefore appears that only corporate documents are involved. A long line of cases has established the rule of law that the privilege

against self-incrimination applies only to natural persons and cannot be utilized by or on behalf of a corporation. *(Campbell Painting Corp. v. Reid, 392 U.S. 286, 20 L.Ed.2d 1094, 88 S.Ct. 1978; Bell v. Maryland, 378 U.S. 226, 263, 12 L.Ed.2d 822, 879* (separate opinion of Mr. Justice Douglas); *United States v. White, 322 U.S. 694, 88 L.Ed. 1542; Essgee Co. of China v. United States, 262 U.S. 151, 67 L.Ed. 917; Wilson v. United States, 221 U.S. 361, 55 L.Ed. 771.)* The corporate records and documents held by an officer or agent of the corporation cannot be the subject of the personal privilege against self-incrimination even though the production of the corporate records and documents may tend to incriminate him personally. *See United States v. White; Wilson v. United States; Essgee Co. of China v. United States; People v. Ryan, 410 Ill. 486.*

The defendants insist that regardless of the last stated principle of law they should be able to assert the fifth amendment privilege because the State is attempting to disregard the corporate existence in order to impose liability on the defendants personally on the theory that the corporations are but the alter egos of the defendants. They assert that the corporate entity cannot be disregarded for such purpose and then used as a reason for denying the defendants the protection of the fifth amendment. This contention has been considered on numerous occasions by the Federal courts which have held that the personal privilege against self-incrimination is relinquished as to corporate books, records and documents by the choice of the corporate form for an individual's business. Corporate records which may tend to incriminate an individual may be used as evidence against him even where the corporation is his mere alter ego. *(Hair Industry Ltd. v. United States, (2d cir.) 340 F.2d 510; United States v. Fago, (2d cir.) 319 F.2d 791; United States v. Guterma, (2d cir.) 272 F.2d 344; Lagow v. United States (2d cir.), 159 F.2d 245.)* We adopt the rule announced in these cases.

The defendants raise a further evidentiary question concerning the admissibility of two sets of documents identified as group exhibits R and S. By stipulation of the parties copies of these exhibits have not been incorporated in the record nor does the evidence define their nature. We are not therefore in a position to pass on their admissibility. The trial court had the opportunity to examine these exhibits. We will not presume error on its part.

The defendants claim that they were denied due process of law in that the tax assessments for which they are held liable were made against the various corporations without notice to defendants. This question is closely related to the alter ego theory which will be discussed later. The defendants elected to list the corporations and not themselves as taxpayers under the Retailers' Occupation Tax Act (Ill. Rev.Stat. 1967, ch. 120, par. 440 *et seq.*) Sections 4 and 5 of the Act provide that notice of tax liability be issued to the taxpayer and that upon the filing of a certified copy of final assessment of tax the circuit court may enter a judgment against the taxpayer. It is not contended that the named taxpayer in each instance did not receive the notice required by statute. The defendants insist however that they were entitled to be personally notified of these assessments and judgments. We do not agree. If there was some objectionable feature about the tax assessments, these defendants through their alter ego corporate entities had the statutory right and the opportunity to have the same reviewed. See *People v. Clauson, 231 Cal.App.2d 374, 41 Cal.Rptr. 691.*

The defendants fail to distinguish the two phases of the tax proceeding. The first phase involves imposition of tax liability against the taxpayer (the corporations and William Pape). After the assessments become final the same are *prima facie* proof of the correctness of the amount due, whether the same have been reduced to judgment against the taxpayer or not. (Ill.Rev.Stat. 1967, ch. 120, pars. 443 and 444.) This phase of the proceeding

has been completed. The other phase of the proceeding involves the collection of the tax. In the present case the Department of Revenue has elected to collect the tax in this suit. The judgment herein is based on and measured by the amounts of tax liability which has been determined in the assessment phase. The imposition of the tax was against the taxpayer and conformed to the statutory requirements. The collection of the tax is a different situation and is the issue in this case. Due process does not require that the defendants be given personal notice in the assessment phase apart from thy notice that was given to their corporate entity before personal liability for the tax can be imposed upon them in a separate proceeding.

The defendants contend that without notice they have been deprived of the opportunity to contest the final assessments and judgments for which they are now held liable. In an action to collect the unpaid tax the issue of the amount due cannot be retried. The assessments are not subject to collateral attack in a suit to collect the tax. *(Department of Finance v. Sinclair, 382 Ill. 118; Department of Finance v. Kilbane, 381 Ill. 117; Department of Finance v. Gold, 369 Ill. 497.)* The proceeding in this case is a suit to collect the tax.

The defendants insist that as a condition precedent to the imposition of personal liability upon them it must be shown that each of the corporations against whom judgments were obtained or assessments made did not have assets to satisfy the same. Section 13½ of the Retailers' Occupation Tax Act (Ill.Rev.Stat. 1967, ch. 120, par. 452½) is cited to support this position. This section imposes personal liability on an officer or employee of a corporation who had the control, supervision and responsibility of filing tax returns and making tax payments and who wilfully failed to do so. This section imposes personal liability in the event that, after proper proceedings for collection of such amounts, the corporation is unable to

pay the tax. The court held the defendants personally liable under this section of the Act for only two of the judgments. Those are the judgments set out under the heading *"First Classification"* above. The court found that it had been determined through citation proceedings to discover assets that there were no assets of these two corporations to satisfy the judgments and imposed personal liability on the defendants under the provision of this section of the Act. The personal liability for the other judgments and assessments listed under the other classifications above was not imposed on the defendants under this section of the Act and the conditions thereof are not applicable to the same.

We have above alluded to the alter ego principle. The court found that the real parties in interest in each of the corporations against which assessments were made were Rocco Pintozzi and Frank Pintozzi. It found that the ownership, control and direction of each store and each corporation were in these two defendants and that they had caused the corporations to be formed. The court found that the corporations were the alter egos of the defendants; that they were a means of doing business by the defendants and that the defendants used the corporate structure as a device by which they committed fraud by collecting taxes from purchasers but not remitting the same to the State. The court then ordered that the separate corporate entities be disregarded and personal liability imposed on the actual owners for the tax due.

The concept of disregarding the corporate existence and imposing liability personally upon the real parties to a transaction is well established and is summarized in 19 C.J.S., Corporations, sec. 839, page 264: "Where the director or officer is the alter ego of the corporation, that is, where there is such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist, and the facts are such that an adherence to the fiction of separate existence of the corporation would

sanction a fraud or promote injustice, such director or officer will be held liable for obligations of the corporation." (See also, 18 Am.Jur.2d, Corporations, sec. 15.) The concept has been variously announced, defined, explained and applied in decisions of many State and Federal courts. (See annotations in 1 A.L.R. 610, 34 A.L.R. 597, and 63 A.L.R.2d 1051.) It has likewise been accepted and applied by the courts of this State for many years. *Lachman v. Martin (1891), 139 Ill. 450; Donovan v. Purtell (1905), 216 Ill. 629; Superior Coal Co. v. Department of Finance (1941), 377 Ill. 282; Dregne v. Five Cent.Cab. Co. (1943), 381 Ill. 594; Carrillo v. O'Hara (1948), 400 Ill. 518; Tilley v. Shippee (1958), 12 Ill.2d 616.*

Except for the contention that evidence in support of the court's findings of fact was erroneously admitted (which we have above discussed) defendants do not assert that the findings of the trial court on the alter ego theory are contrary to the evidence. The findings of the court adequately support the imposition of liability against Rocco Pintozzi and Frank Pintozzi for the tax liabilities of the corporations listed above under the headings of *"Third Classification"* and *"Fourth Classification"* under the alter ego theory.

Remaining for our consideration of the items for which the trial court held the defendants personally liable are those listed under the heading above of *"Second Classification,"* which consists of two judgments the State had previously obtained against William Pape. These judgments were affirmed on appeal by this court in *Pape v. Department of Revenue, 40 Ill.2d 442.* Defendants now contend that the prohibition against attacking a judgment collaterally prohibits the State from attempting to impose liability for these judgments on the defendants. We disagree. The judgments were based on tax assessments made for a liquor store located at 1423 West 55th Street in La Grange and covered periods from January 1, 1962, through April 20, 1965. These assessments were made

against William Pape pursuant to section 4 of the Retailers' Occupation Tax Act. (Ill.Rev.Stat. 1967, ch. 120, par. 443.) His signature had been forged on the application for a certificate of registration made to the Department of Revenue under section 441a of the Act and on tax returns filed on behalf of the store. During the period covered by these judgments the liquor store at 1423 West 55th Street in La Grange was one of a chain of stores owned and operated by the principal defendants through their various corporate entities. It appears that the corporate entity involved in the operation of this store was Countryside Food & Beverage, Inc. The books and records for this store were kept by the same accountant who kept the books for the other stores in the chain. He also prepared the tax returns for the store and at the direction of Rocco Pintozzi signed William Pape's name thereto. William Pape was a nephew of the defendants and was a part-time employee in one of the other liquor stores.

We do not view this as a collateral attack upon the judgments affirmed by this court in 40 Ill.2d 442. Pursuant to the statute the State had recovered judgments against William Pape for tax assessments. The State is not trying to set the judgments aside in this action or attack them in any manner. Those judgments stand as the measure of the amount of taxes due for that period from the liquor store at 1423 West 55th Street in La Grange just as the judgments against the various corporations under the above heading *"Third Classification"* stand as the measure of taxes due from those operations. By this suit the State is attempting to impose liability for all of these judgments upon the persons actually responsible.

The trial court found that William Pape never had an interest in this store but that the real owners were the principal defendants and that it was they who caused William Pape's name to be forged to the documents. The use of William Pape by the defendants was but another contrived subterfuge to evade the liability for the tax. The

same maxim of equity which authorizes the corporate structure to be disregarded and liability for the tax to be imposed on the defendants likewise permits a court to disregard the subterfuge of William Pape and reach the real persons responsible for the tax. Equity is not concerned with the form of a transaction but will look beyond the form to the substance thereof. (See 30 C.J.S., Equity, sec. 107; 27 Am.Jur.2d, Equity, sec. 127; *White v. Cotzhausen, 129 U.S. 329, 32 L.Ed. 677; Preston v. Spaulding, 120 Ill. 208; Smurr v. Kamen, 301 Ill. 179; Addis v. Grange, 358 Ill. 127; Knights v. Knights, 300 Ill. 618.)* This same equitable maxim was followed in *Carrillo v. O'Hara, 400 Ill. 518,* and *Tilley v. Shippee, 12 Ill.2d 616,* to permit courts to penetrate behind the screen of the corporate entity. This equitable maxim likewise permits the court to impose liability on the two principal defendants for the judgments against William Pape.

The Use Tax Act (Ill.Rev.Stat. 1967, ch. 120, par 439.1 *et seq.),* in section 3 imposes a tax upon the privilege of using in this State tangible personal property purchased at retail from a retailer and provides that the tax shall be collected from the purchaser by a retailer maintaining a place of business in this State and remitted to the Department of Revenue. The net result of imposing the use tax on personal property purchased at retail is to superimpose the use tax on the retailers' occupation tax. However, to prevent pyramiding, the Use Tax Act contains an offsetting provision. The retailer collects the tax but need not remit that part of any tax collected to the extent that he does remit the tax imposed by the Retailers' Occupation Tax Act with respect to the sale of the same property. Ill.Rev.Stat. 1967, ch. 120, par. 439.9; see Ice, The Retailers' Occupation Tax Act and Related Tax Laws, 1961 Illinois Law Forum, 614.

Here the tax required by the Use Tax Act to be collected from the purchasers was in fact collected but the

defendants did not remit the tax due to the State. These tax funds were retained by these defendants and commingled with their own funds and the commingled funds were used to acquire the stores and property held by the receiver and to acquire and improve other real estate. The court imposed a constructive trust on properties acquired by Rocco Pintozzi and Frank Pintozzi from July 1, 1959 (the date the complaint alleges the fraudulent conduct began) to September 28, 1967 (the date the receiver was appointed). The court also declared the places of business which had been under the control of the receiver to be under the constructive trust.

The defendants complain that some of the real estate over which a receiver had been appointed and which was included in the constructive trust is owned by the wives of the principal defendants. The wives own interests in real estate some of which had been acquired before and some after July 1, 1959. We will first consider real estate or improvements thereon acquired or paid for after July 1, 1959. The evidence supports the court's findings that these acquisitions and improvements were paid for from funds with which the fraudulently retained tax funds had been commingled. Under such circumstances the State has an equitable claim on these acquisitions and improvements. (*People ex rel. Nelson v. Peoples State Bank of Maywood, 354 Ill. 519; Woodhouse v. Crandall, 197 Ill. 104;* 54 Am.Jur., Trusts, sec. 246; Restatement of the Law of Restitution, sec. 211, Comment (c) of subsection (1).) The appointment of a receiver to preserve these properties and the imposition of a constructive trust thereon was proper.

However, as to the interests in the real estate owned by Hazel and Geraldine Pintozzi before July 1, 1959, over which a receiver had been appointed and which was declared a part of the corpus of the constructive trust, we are of the opinion that such interests were not properly included as part of the corpus of the trust. The findings of the court did not determine the question of the interests of the wives acquired before July 1, 1959.

Although there is some evidence that the practice of reporting a fraction of the gross receipts on the tax returns had been used by the defendants from about 1952, the earliest assessment for taxes dates from July 1, 1959. This is the date the complaint alleges as the commencement of the fraudulent practices. Rocco Pintozzi and his wife, Hazel, acquired a joint interest in a part of the property located on 55th Street in La Grange in 1956. Shortly thereafter Frank Pintozzi and his wife, Geraldine, acquired interests in the same property. Hazel Pintozzi and Geraldine Pintozzi had acquired interests in this real estate prior to the date of alleged fraudulent conduct by their husbands. The findings of the court absolve the wives of any wrongdoing and no personal liability was imposed upon them. It would therefore be inequitable to impose a constructive trust upon their interests in real estate acquired before any fraudulent withholding of tax funds and commingling of the same with personal funds by their husbands. Accordingly, upon remand the trial court should ascertain the present net value of the interest which each of the wives of the two principal defendants had acquired in any real estate or improvements thereon prior to July 1, 1959, and upon which a constructive trust has been imposed, and this amount should be set off to Hazel and Geraldine Pintozzi upon liquidation of said property.

The decision of the circuit court of Cook County will be affirmed except as to the interest of Hazel and Geraldine Pintozzi in real estate acquired prior to July 1, 1959. As to said interest the decision of the trial court is reversed and the cause is remanded for further proceedings in accordance with directions contained herein.

*Affirmed in part and reversed in part and remanded, with directions.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.