September 9, 1998 Docket NO. 5-97-0352

IN THE 

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

                                     )  Circuit Court of

     Plaintiff-Appellant,            )  St. Clair County.  

                                     )  

v.                                   )  No. 95-CH-126

                                     )  

V & M INDUSTRIES, INC.,              )

                                     )

     Defendant,                      )

                                     )

and                                  )

                                     )

VERNON LEIRER,                       )  Honorable

                                     )  Robert L. Craig, 

     Defendant-Appellee.             )  Judge, presiding.  

_________________________________________________________________

JUSTICE GOLDENHERSH delivered the opinion of the court:  

Plaintiff, the People of the State of Illinois, originally institut­ed this action against defendant V & M Industries, Inc. (V & M), for injunctive relief and civil penalties under the Illinois Environmental Protection Act (the Act) (415 ILCS 5/1 
et seq.
 (West 1994)) after approximately 40,000 to 50,000 tires burned on property owned by V & M.  V & M was dissolved by the time the suit was filed.  Plaintiff subsequently added defendant Vernon Leirer (Vernon), personally.  Plaintiff alleged that Vernon was actually the alter ego of V & M.  The trial court, sitting without a jury, dismissed the cause as to Vernon, finding that Vernon was not personally liable for his actions or for violations of the Act.  V & M was held accountable, so long as plaintiff requested relief within 14 days after the order was entered.  Plaintiff decided against pursuing V & M, now a defunct entity with virtually no assets and no officers.  On appeal, plaintiff contends the trial court erred (1) in failing to find Vernon responsible for air pollution and failing to grant injunctive relief and (2) in refusing to pierce the corporate veil and hold Vernon personally responsible.  We reverse and remand.

FACTS

To understand the instant case, we must go back to the 1970s when Vernon was involved in various corporations, including Five Star Metal Fabricators, Inc., and Five Star Mechanical, Inc.  In the late 1970s, Industrial Machinings and Metals, Inc. (Industrial Machinings), was incorporated for the purpose of repairing railroad cars.  Vernon claimed that Industrial Machinings was 98% owned by his children and that his wife, Mildred, and he owned 1% each.  Mildred, on the other hand, testified that Vernon runs Industri­al Machinings.  A review of Mildred's testimony shows that she was in the dark as to how any of the corporations, including the Five Star companies, Industrial Machinings, or V & M, actually operate.  Mildred was sure, however, that Vernon runs the show.  

On February 11, 1981, Industrial Machinings purchased 14 acres of property that borders Missouri Avenue in East St. Louis, commonly known as the Obear-Nester property, from the East St. Louis Port Authority (Port Authority).  It was a bond-for-deed transaction.  On October 15, 1986, V & M was incorporated in Illinois.  At its inception, Vernon owned 99% of the corporation.  Vernon, a daughter, and a son-in-law were listed as officers.  After V & M was incorporat­ed, Industrial Machinings transferred the Obear-Nester property to it.  According to Vernon, V & M was incorporated for the sole purpose of renting out this property to various tenants.  V & M had virtually no assets.  It assumed the bond-for-deed from the Port Authority.  Industri­al Machinings loaned V & M the money to pay the Port Authority.  Exhibit No. 50 shows the sale of the Obear-Nester property to V & M for $54,869.81, plus the unpaid Port Authority mortgage.  Exhibit No. 51 shows the sales amount as $1,300, plus the unpaid mortgage.  It is unclear why there are two sets of corporate minutes involving the sale of the Obear-Nester property.  What is clear is that at the time of the purchase of this property, Vernon was president and secretary of Industrial Machinings and 100% owner of V & M.  He later sold 1% of V & M to Abb Rhodes and 1% to James Rodriguez for $50 each.  Secretary of State records confirm the addition of Rhodes and Rodriguez and the deletion of Vernon's family members. 

One of the renters of the Obear-Nester property was David Mullinex.  It was Mullinex who brought onto the property the tires that caught fire.  A lease agreement was signed on March 9, 1989, between Mullinex and Vernon of V & M.  Mullinex testified that Vernon was the only person he dealt with in negotiating the lease.  According to Mullinex, Vernon told him that he owned the property.  There was no mention of V & M.  Mullinex and Vernon intended to start a tire-shredding operation at the site.  According to Mullinex, Vernon offered to be a third partner with him and his brother, Mike.  Mullinex and Vernon went to a St. Louis company to investigate tire shredders and to a tire seminar in the Ozarks.  The agreement between Mullinex and Vernon fell apart, and the tire-

shredding operation never materialized.  Mullinex then abandoned the tires, but Vernon indicated continuing interest in the tire-

shredding operation, as evidenced by the letters he sent to the Illinois Environmental Protection Agency (the Agency).  

After Mullinex defaulted on the contract, the Agency got involved.  The Agency wanted the tires removed and filed suit against V & M Industries and against Vernon individual­ly.  Vernon and the Agency negotiated a tire-removal agreement, incorporated into a court order in No. 90-MR-178.  Vernon signed all the documents in conjunction with this agreement as an authorized representative of V & M.  Notwith­standing his signature as an authorized represen­ta­tive of V & M, the record reflects that no one else from V & M conferred with the Agency except Vernon and that Vernon consulted with no other corporate officers about the tire-

removal agreement.  The agreement was signed on November 30, 1992.  Vernon admits that V & M did not have the assets to remove the tires as agreed.  In September 1993, the tire-removal agreement was in place, but when Doug Hayward of the Agency's used-tire program inspected the site in question, he found the site to be in noncompliance.  Forty percent of the tires were to be removed at that time, but they were not.  He estimated that there were 50,000 tires present on the property.

Abb Rhodes, who was president of V & M at the time of negotiations between Mullinex and Vernon, stated that he was aware  of the agreement between Vernon and Mullinex to bring tires on the property; however, Vernon made all the arrangements.  There was never a corporate meeting on this issue.  Rhodes testified that he received no stock certificates.  Vernon could not remember any stock being issued either.  Rhodes also testified that corporate meetings consisted of standing around the yard and talking.  According to Rhodes, no minutes were ever recorded.  Rhodes was not aware how much money was being collected from various renters.  Rhodes testified that Industrial Machinings took care of V & M financially for at least five years because V & M had no money.  Vernon signed all the checks and had complete control of the checkbook.

Vernon testified that he transferred his 98% ownership in V & M around October 1, 1993, to James Rodriguez for $1.  On January 8, 1994, Rodriguez transferred almost all of the 14 acres back to Vernon for no money.  The 150-foot-by-150-foot area where the tires burned was not transferred back to Vernon but remained an asset of V & M.  Rodriguez is now deceased and could not be called as a witness.  

On October 6, 1993, a meeting was conducted between Rhodes and Vernon.  Rodriguez was not present.  Minutes were recorded at this meeting, the only V & M minutes ever discovered during the litigation.  The minutes show that Vernon proposed to use any money available to pay the Port Authority $51,000 as final payment for the property.  The resolution passed with votes by Vernon and Rhodes.  However, according to the Secretary of State's records and Vernon's own testimony, Vernon was no longer an officer or a shareholder of the corporation.  Vernon sold his ownership interest in V & M to Rodriguez for $1 by this time.  Vernon testified that V & M did not have the money to pay the loan, so the money was borrowed from Industrial Machinings.  Vernon wrote a check for $51,000 from the Industrial Machinings account, and the Port Authority released V & M from the bond for deed.  

On November 1, 1993, the Agency sent Vernon a letter concerning noncompliance with the tire-removal agreement.  On November 15, 1993, a land trust was created for the 14 acres of V & M property, commonly referred to the Obear-Nester property, excluding, however, the 150-foot-by-150-foot area where the tires later burned.  Vernon is the sole beneficiary of this land trust.  Prior to transferring the deed from V & M to Vernon's land trust, Rodriguez signed a $25,000 mortgage to Industrial Machinings dated November 15, 1993.  It was notarized on January 8, 1994.  On January 18, 1994, a warranty deed from V & M to a land trust, with Paul Chapman as the designated trustee, was notarized and signed by James Rodriguez and Abb Rhodes.

On November 18, 1993, V & M and Urioste Companies, Inc. (Urioste, Inc.), entered into a contract for the recycling of steel from a V & M building on the Obear-Nester property.  The contract provided that Urioste, Inc., would pay $100,000 for the right to remove the steel.  Vernon signed the contract as treasurer of V & M but listed his home address under the signature block.  According to the Secretary of State's records and Vernon's own testimony, Vernon was not the treasurer of V & M on this date.  Michael Urioste of Urioste, Inc., testified that he talked with only Vernon and no one else concerning the contract between V & M and Urioste, Inc.  According to Urioste, Vernon made it very clear that he owned everything.  On the date the contract was signed, Urioste gave Vernon a check made out to Vernon personally for $50,000 as a first installment.  Another check for $49,000 was given to Vernon from Urioste on January 7, 1994.  On February 5, 1994, two checks totaling $1,000 were paid to Vernon from Urioste.  On March 7, 1994, a $1,500 check was given to Vernon from Urioste to pay for a trailer which had incorrectly been cut apart as part of the salvage operation.  Deposit slips were introduced into evidence to show that the checks for $49,000 and %50,000 were later deposited into Industrial Machinings' account.  

Urioste testified that when he started the salvage operation at the V & M building, tires were scattered throughout the building and were a problem.  Eventually, Vernon told him to move the tires to a site in the corner of the property.  According to Urioste:  "[Vernon] was going to sell off this property eventually and *** if he would deed this property over to somebody else, it would become the problem of the State ***.  [Vernon] said that if [the tires] caught on fire, it wouldn't be his problem, it would be a good way to get rid of them."  Urioste explained that he argued with Vernon over the terms of the contract and told Vernon that he had only agreed to remove the tires from the building, not to load them in a specific area.  Eventually, two weeks prior to the fire, Willie Rone came to the site and struck a deal with Vernon to move the tires to the 150-foot-by-150-foot area where they burned.

Plaintiff produced evidence that Mildred received over $500,000 from Industrial Machinings from 1992 through 1995 by way of several monthly checks.  Mildred was unaware of these payments.  As previously stated, Mildred's testimony indicates that she was completely unaware of Vernon's business dealings in V & M or any of his other businesses.  

A bank signature card for a V & M account, dated March 6, 1987, shows that only Vernon and Mildred are authorized to write checks on the account.  Likewise, Vernon wrote all checks and withdrawals on the Industrial Machinings account.  On March 17, 1994, Vernon signed a check on V & M's account made payable to Industrial Machinings for $1,000.  At this time, Vernon was not an officer of V & M.

On April 8, 1994, approximately 40,000 to 50,000 tires that  were stacked in the 150-foot-by-150-foot area previously discussed caught fire.  It took numerous firefighters approximately one week to extinguish the fire.  Exhibits showing huge black smoke clouds hovering over the East St. Louis area were introduced into evidence.  Also introduced into evidence was convincing expert testimony concerning the human carcinogens and deadly poisons emitted into the lower level of the atmosphere due to this fire and testimony concerning the long- and short-term effects on human health.  

As to the procedural history of this case, on January 25, 1995, plaintiff filed the instant lawsuit against V & M.  A default judgment was entered on February 29, 1996.  Plaintiff amended its complaint on October 9, 1995, to add Vernon personally.  A second amended complaint was filed on May 17, 1996.  After hearing five days of testimony over a three-month period, beginning in August 1996, and after allowing time for briefs to be filed, the trial court took the case under advisement.  On May 13, 1997, the trial court entered judgment for Vernon and against plaintiff in a three-

page order in which it found that plaintiff "failed to sustain its burden of demonstrating that the individual defendant, Vernon Leirer, was the alter ego of V & M Industries, Inc., or that Leirer or V & M engaged in any fraud, injustice[,] or attempts to defraud creditors, or that V & M was undercapitalized for its purpose."  While V & M was held accountable, plaintiff decided against pursuing V & M because it had already been dissolved and had virtually no assets.  Plaintiff filed a timely notice of appeal as to Vernon.  

ANALYSIS

The issue we are asked to consider is whether the evidence presented warrants piercing the corporate veil and imposing personal liability on Vernon.  Plaintiff contends that Vernon's dealings, including those cloaked in the corporate fiction of Industrial Machinings, should be subjected to rigorous scrutiny and that when they are, they show that V & M was not separate and distinct from Vernon and, thus, we must reverse the ruling of the trial court and impose personal liability upon Vernon.  Plaintiff specifically refers us to the tire-removal agreement negotiated by Vernon with the Agency, the Urioste contract negotiated by Vernon, allegedly for V & M, the checks from Urioste deposited into Industrial Machinings' account, rather than a V & M account, and Vernon's ultimate ownership of the Obear-Nester 14-acre site, "minus the offensive tire fire debris area."  Vernon replies that the trial court's ruling that the corporate veil between V & M and Vernon should not be pierced is not against the manifest weight of the evidence.  Vernon insists that the requirements for piercing have not been met.  After reviewing the record before us and considering the law with regard to piercing the corporate veil, we agree with plaintiff that the evidence warranted piercing the corporate veil.  

A court may find corporate officers personally liable for corporate obligations, through a remedy known as piercing the corporate veil.  
Ted Harrison Oil Co. v. Dokka
, 247 Ill. App. 3d 791, 617 N.E.2d 898 (1993).  In order to pierce the corporate veil, there must be (1) such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) circumstances which exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.  
Ted Harrison Oil Co.
, 247 Ill. App. 3d at 795, 617 N.E.2d at 901, citing 
People ex rel. Scott v. Pintozzi
, 50 Ill. 2d 115, 128-29, 277 N.E.2d 844, 851-52 (1971).  A corporate entity will be disregarded if it would otherwise present an obstacle to the protection of private rights or if the corporation is an alter ego or business conduit of the governing or dominant personality.  
Import Sales, Inc. v. Continental Bearings Corp
., 217 Ill. App. 3d 893, 904, 577 N.E.2d 1205, 1212 (1991).  More succinctly, "[s]ome element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard or pierce the corporate veil."  
Berlinger's, Inc. v. Beef's Finest, Inc
., 57 Ill. App. 3d 319, 324, 372 N.E.2d 1043, 1048 (1978).  A reviewing court will only reverse a finding of the trial court on the issue of piercing the corporate veil if it is against the manifest weight of the evidence.  
Ted Harrison Oil Co.
, 247 Ill. App. 3d at 796, 617 N.E.2d at 902.  

In determin­ing whether to disregard a corporate entity, a court should consider the following variables, with no single factor being determinative: (1) inadequate capital­ization, (2) the failure to issue stock, (3) the failure to observe corporate formalities, (4) the payment of dividends, (5) the insolvency of the debtor corporation at the time, (6) the nonfunctioning of other corporate officers or directors, (7) the absence of corporate records, and (8) whether the corporation is a mere facade for the operation of dominant stockholders.  
Ted Harrison Oil Co.
, 247 Ill. App. 3d at 795, 617 N.E.2d at 902.  In the instant case, we find that each and every one of these factors are present.  

First, while Vernon asserts to the contrary, it is clear that V & M was undercapi­talized.  Vernon argues that the purpose of V & M was to lease property to others and that, accordingly, no assets were needed.  However, in order to lease property, V & M had to buy property.  It relied on Industrial Machinings to buy the property.  Further, Vernon admitted that when he signed the tire-

removal agree­ment, V & M did not have the assets to remove the tires.  Vernon contends that there was a renter on the property and that it was his desire to use that money for the tire removal, but this never material­ized.  Abb Rhodes, who at one time was a corporate officer, testified that Industrial Machinings actually paid the debts of V & M for five years, possibly longer.  Under these circumstanc­es, we find that V & M was inadequately capitalized. 

Second, there appears to be a failure to issue stock.  Vernon testified that he owned 99% of V & M when it started and that his daughter and son-in-law owned the remaining 1%.  No stock certificates are on file.  In October 1998, Rodriguez and Rhodes bought into the corporation for $50 each.  However, Rhodes testified that he was never issued a stock certificate.  Vernon's own brief admits that "certificates of ownership may not have been [issued]."

Third, we find, contrary to Vernon's assertions, that V & M failed to observe corporate formalities.  For example, the only V & M records ever discovered during this litigation were from a meeting in which Vernon proposed to use any money available to pay the Port Authority the final $51,000.  The resolution was passed by Vernon and Rhodes; however, Secretary of State records indicate that Vernon was no longer a shareholder or a corporate officer when this meeting was held.  Likewise, when Vernon negotiated the $100,000 contract with Urioste, he signed as treasurer, yet Secretary of State records and Vernon's own testimony prove that Vernon was not the treasurer on this date.  We agree with Vernon that every corporation acts through its agents, but we cannot agree that Vernon acted consistently for the benefit of V & M.  Vernon's business dealings on behalf of V & M during times he was allegedly not even a part of V & M show such unity of interest and ownership that Vernon and V & M were for all practical purposes coextensive.  Vernon exercised ownership, direction, and control over V & M.  Moreover, Rhodes testified that Vernon ran the show and that no minutes were ever recorded.  While officers were elected, they clearly had no authority.  Meetings consisted of nothing more than standing around the yard and talking.  While articles of incorporation and annual reports were filed with the Secretary of State, the record confirms that corporate formalities were regularly over­looked.  

Fourth, no dividends were paid. 

Fifth, V & M was insolvent at the time of trial.  In fact, V & M was never adequately funded.  By March of 1996, V & M was totally dissolved. 

Sixth, the record is replete with references to the fact that other corporate officers and directors were nonfunctioning.  Vernon clearly was V & M, as well as Industrial Machinings.  Even after he sold his shares of V & M to Rodriguez for "a buck," Vernon still continued to direct the business affairs of V & M.  

Seventh, as previously set forth, there is an absence of corporate records.  While V & M was incorporated and papers were filed with the Secretary of State, only one set of minutes was ever discovered.  It was alleged that Rodriguez had the other corporate records, but Rodriguez was dead.  We believe that plaintiff, through the testimony of witnesses such as Rhodes, Mullinex, and Urioste, proved an absence of corporate records.

Finally, we conclude after a complete review of the record that the corporation was a mere facade for the operation of the dominant stockholder, Vernon.  Urioste's checks totaling $100,000 were made payable to Vernon personally.  Later, Vernon deposited this money into the Industrial Machinings accounts, not V & M accounts.  While Vernon argues that Industrial Machinings was owned by his children and not him, the record suggests otherwise.  Records were introduced showing that Mildred was paid a total of $533,000 from Industrial Machinings from 1992 through 1995, yet Mildred herself was completely unaware of such disbursements, an example of Vernon's control over both V & M and Industrial Machinings.  The record also shows that Vernon wrote two checks from his personal account to pay the Port Authority installments due on the bond-for-deed for the Obear-Nester property.  Other payments on this property were made from the Industrial Machinings account.  Vernon argues vehemently that Industrial Machinings is not a party to this suit and that there is nothing between V & M and Industrial Machinings to warrant piercing the corporate veil.  We conclude to the contrary.  Plaintiff presented overwhelming evidence that Vernon is both V & M and Industrial Machinings and that the relationship is relevant.  

Vernon cites 
Jacobson v. Buffalo Rock Shooters Supply, Inc
., 278 Ill. App. 3d 1084, 664 N.E.2d 328 (1996), in support of his contention that piercing the corporate veil is not justified in the instant situation.  In 
Jacobson
, following an explosion, actions were brought by the estates of two deceased employees of the corporation.  The estates sought to pierce the corporate veil and collect from the share­holders on workers' compensation judgments of $251,750 each.  The corporation had failed to obtain workers' compensation insurance.  Our colleagues on the Third District Appellate Court refused to pierce the corporate veil, finding that the record supported the trial court's finding that the corporation was a separate entity and not the alter ego of its shareholders.  278 Ill. App. 3d at 1090-91, 664 N.E.2d at 332.  We find 
Jacobson
 distin­guishable from the instant case.  

In 
Jacobson
, there were three shareholders, two of whom were killed in the same explosion as the two deceased employees.  278 Ill. App. 3d at 1086, 664 N.E.2d at 329.  The corpora­tion had substantial assets prior to the explo­sion, including inventory and equipment, and was not undercapital­ized.  278 Ill. App. 3d at 1090, 664 N.E.2d at 332.  The corporation's failure to obtain workers' compensation insurance was found not to be an adequate basis for piercing the corporate veil.  278 Ill. App. 3d at 1090, 664 N.E.2d at 332.  The instant case in no way involves workers' compensation insurance.  Moreover, a thorough reading of 
Jacobson
 shows that a tragedy occurred for all involved, sharehold­ers, officers, and employees.  Here, the people affected were the residents of the area where this fire occurred.  The tires were placed in an area measuring 150 feet by 150 feet and then caught on fire.  The 150-

foot-by-150-foot area was the only asset of V & M at the time of this fire.  The remaining 14 acres had been put into a land trust with Vernon as beneficiary.  The circum­stances in this case are overwhelming to the point that adherence to the fiction of a separate corporate existence would indeed sanction a fraud, promote injustice, and promote inequitable consequences.  The circuit court found sufficient evidence to hold V & M accountable, but plaintiff decided against pursuing a defunct entity whose only asset was the 150-foot-by-150-foot area contain­ing burnt tire debris.  The trial court's refusal to pierce the corporate veil and refusal to hold Vernon personally responsible was against the manifest weight of  the evidence.

For the foregoing reasons, the judgment of the circuit court of St. Clair County refusing to hold Vernon personally responsible is reversed, and the cause is remanded for further proceedings.  

Reversed and remanded.

CHAPMAN and MAAG, JJ., concur.